[Cite as *Priddy v. Kline*, 2025-Ohio-5718.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| PAMELA PRIDDY, | CASE NO. 2025-T-0031 |
| Plaintiff-Appellee, | |
| - vs - | Civil Appeal from the Court of Common Pleas |
| KENNETH KLINE, | |
| Defendant-Appellant. | Trial Court No. 2023 CV 00627 |

## OPINION AND JUDGMENT ENTRY

Decided: December 22, 2025
Judgment: Reversed

*Andrew C. Stebbins*, *Christina N. Williams*, and *Emily M. Grigas*, Buckingham, Doolittle & Burroughs, L.L.C., 1375 East Ninth Street, Suite 1700, Cleveland, OH 44114 (For Plaintiff-Appellee).

*Ryan C. Spitzer* and *Brian M. Zets*, Isaac Wiles Burkholder & Miller, L.L.C., Two Miranova Place, Suite 700, Columbus, OH 43215 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Kenneth Kline, appeals the interlocutory order of the Trumbull County Court of Common Pleas denying his motion for summary judgment relating to his claim of immunity, pursuant to R.C. Chapter 2744. We reverse the trial court and enter judgment in favor of Mr. Kline granting him immunity from the underlying claims.

{¶2} Appellee, Pamela Priddy, served as the Village Manager of Newton Falls since 2021. All employment decisions related to Ms. Priddy's position, inclusive of decisions regarding termination, are governed by Village Council and require a majority

of members of council for action. Mr. Kline was the Mayor of the Village of Newton Falls when Ms. Priddy was first appointed Village Manager.

{¶3} In addition to managing the village's various departments, the Village Manager is required to keep Village Council advised of the financial condition and future needs of the village and make recommendations to council concerning the affairs of the city.

{¶4} In 2021, when Ms. Priddy became Village Manager, Newton Falls was in significant financial distress due, in part, to funding issues related to the Village's police department. The police department contracted with Newton Falls School District ("the District") to place a village police department school resource officer ("SRO") in the school. In August 2022, the Newton Falls Village School District Board of Education ("the Board") and the Village of Newton Falls Police Department entered into an agreement under which the police department would provide security for schools as SROs.

{¶5} Under the contract, the school district was responsible for the funds to pay for the services of the SRO, which was an amount above what the village paid the police department for police services. The evidence suggests, however, the agreement was contingent upon the existence of the Newton Falls Police Department.

{¶6} Council disbanded the Village Police Department in November or December 2022 following a levy failure amidst the village's continued financial distress. In January 2023, Ms. Priddy spoke with the school district's Superintendent, Justin Christopher, and explained the village could not afford to continue offering an SRO from Newton Falls Police Department. As a result, the school district would have to pay for the entire cost of an SRO. According to Ms. Priddy, Mr. Christopher was "okay with

everything." He apparently did not mind paying the additional charges, and Ms. Priddy indicated he could have his choice of which SRO he wanted.

{¶7} No contractual amendment was made to the District's SRO payment obligations and Ms. Priddy did not "believe" the District canceled the contract.

{¶8} Ms. Priddy did not have any conversations with Mr. Christopher between January 20, 2023 and March 15, 2023. On the latter date, the SRO was still on site at the school, but no arrangements for the costs of the SRO had been made. Ms. Priddy attempted to contact Mr. Christopher regarding the cost/payment issues regarding the SRO; she did not receive a response. Accordingly, on March 16, 2023, Ms. Priddy notified Mr. Christopher she would be "pulling" the acting SRO unless she heard back from him. She maintained her tact was to compel Mr. Christopher to respond because the village did not have the resources to pay for the officer (after the disbandment of the police department).

{¶9} Mr. Christopher replied that he did not have the authority to approve any amendment to the original SRO agreement without the approval of the Board. Later, at approximately 6 p.m., March 16, 2023, Mr. Christopher emailed the Board. The email stated, in part:

> Today, the village manager threatened to pull the SRO from the school if we did not agree to pay the additional amount. I replied back . . . I vaguely recall having a conversation with you about added costs for having the SRO. As you know, I cannot solely act on approving any amendment to the original SRO agreement that we have without the Board of Education approving the authorization of funds. I would need something in writing from the Village outlining the additional costs and amendments to the contract. The school legal attorney would then need to review the contract amendments before I can make the recommendation to the board of education to approve the additional expenditure. The village manager sent

Case No. 2025-T-0031

an email this evening declaring that she is pulling the SRO from the school.

I reached out [to] the sheriff's department this evening and spoke with Commander Villanueva about the situation and he assured me that the sheriff's department will provide the school with an additional presence on the campus, sheriff deputy walkthroughs of the buildings and added patrol on the campus. I have a follow up phone call with him tomorrow to discuss a more permanent arrangement to get us through the remainder of the school year. Additionally, we discussed the need for SRO's from the sheriff's department for the next school year. I will keep you updated as this situation continues to unfold.

{¶10} As discussed below, the information in the email sent by Mr. Christopher was made available to Mr. Kline.

{¶11} Notwithstanding the representations in the various emails, at no time did Ms. Priddy state that she actually "pulled" the acting SRO. Indeed, Ms. Priddy attempted to call Mr. Kline but could not reach him.

{¶12} Later, at 6:25 p.m., March 16, 2023, Mr. Kline sent Ms. Priddy a text asking "where [sic] you calling about school resource officer? Tonya [Mr. Kline's wife, who is on the school board], got a[n] email about it and I told her I don't know anything about it[.]" Ms. Priddy responded, "Yes. Does Tonya know if they need him to report there tomorrow?? I will have to let [the acting SRO] know because he drives in from Akron." Mr. Kline replied, "I'm not sure[,] Tonya is asking[.] [Mr. Christopher] told Tonya that they will have [a] sheriff there tomorrow and are working on a permanent agreement. So it worked out best for all involved. Thank you for the info."

{¶13} Ms. Priddy subsequently contacted the acting SRO, and he indicated the school had not communicated with him that day. Ms. Priddy replied, "OK. Well I have no idea what they are doing. So I guess unless you hear otherwise from me. You don't need

Case No. 2025-T-0031

to go to the school tomorrow." The SRO replied, "So do not report?" Ms. Priddy responded, "Not to the school. Apparently they have an agreement in place with the sheriff. . . ."

{¶14} The following morning, on March 17, 2023, Ms. Priddy averred that she was advised a sheriff's deputy was not present as an SRO at the school. Ms. Priddy also averred, however, she made arrangements to ensure "someone actually appeared through communications with the Sheriff's office."

{¶15} On March 21, 2023, the public became aware of the issues surrounding the presence (or lack of presence) of an SRO at Newton Falls School. Mr. Kline stated, "I got phone calls, I got texts, I get residents stopping at my house, residents stopping me in the bread aisle, the milk aisle, and the park and everything you can think of concerning and wondering is that true what they've heard."

{¶16} For instance, on March 21, 2023, a citizen, who shall remain unnamed, sent an email directed to Mr. Kline regarding, inter alia, the SRO issue. The citizen stated:

> First, I have to say that referring to you as the mayor is merely a formality. You don't deserve the title.
>
> With that said, you sir are the most ineffectual Mayor this village has ever elected. The level of cowardice[,] incompetence, and lack of intellect is absolutely staggering. The way you stand by and do nothing while the entire village circles the drain is mind blowing. You['re] ability to stick your head into the sand and ignore idiotic decision after idiotic decision is almost impressive if it wasn't so sad.
>
> The most recent instance involving the removal of the contracted School Resource Officer should be the final nail in the coffin for you and colleagues, and for any future attempts at being public officials. As usual, none of you informed the public. The public had to find out on their own.

You are the absolute worst representative for our village – but, that makes sense. You are right in line with the other embarrassments that "run" our administration and our council.

Liars, thieves, bullies, drunks, and morons. That's the company you keep. To watch you all destroy this town day after day is absolutely heartbreaking. None of you actually care about the health or the future of the village or any of its residents. Your actions and failures speak louder than anything you could ever say or have said.

Resign.

Apologize to the residents for your failures and for ever thinking you could be mayor of this village.

{¶17}   In a later email, an additional, agitated resident observed, "Considering your wife is on the school board, I would think that you knew prior to this what was going on and you let it slide. WE DESERVE BETTER."

{¶18}   Meanwhile, after receiving agitated messages and reactions from village residents, Mr. Kline, on March 22, 2023, sent Ms. Priddy a text stating, "This whole situation is a stinking mess. I am getting 59 million questions over and over that by now my head is spinning and I wish you and [Mr. Christopher] had simpl[y] had a meeting on it. I'm not pointing fingers at you or him. But just really losing my mind over this as it had turned out exactly as I said it would." Ms. Priddy responded, noting her frustration with Mr. Christopher, who did not respond to her communications to address the issues. ("[A]s of today[,] still no return phone calls. Even as of last Thursday [March 17, 2023] I was trying to communicate with him and again crickets. You had to tell me that the sheriff would be at school the next day.").

{¶19}   On the same day, March 22, 2023, a regularly scheduled school board meeting occurred. In preparation for the meeting, Ms. Priddy collected various

Case No. 2025-T-0031

communications and documents that set forth what had transpired in the preceding months regarding the increased costs for the SRO and her attempts to resolve the issues prior to March 16, 2023. The packet included Ms. Priddy's complete communications with members of the school district from January 2023 through March 2023 with regard to the increased cost of providing an SRO. Significantly, the packet included her email from March 16, 2023, representing the SRO would have to be "pulled" if school officials did not respond.

{¶20} The packet also included messages between Ms. Priddy and Mr. Kline on the evening of March 16, 2023, regarding the SRO issues. Ms. Priddy redacted a portion of the text message wherein Mr. Kline asked "w[]ere you calling about school resource officer?" and "Tonya got a[n] email about it and I told her I don't know anything about it." The remainder of the short text thread remained. Ms. Priddy made the packet available to any individual who requested it but did not actively distribute the packet.

{¶21} After the meeting, on March 24, 2023, Mr. Kline sent an email to, among others, Ms. Priddy and the members of Newton Falls City Council stating:

> As the mayor of Newton Falls I am on this day, Friday March 24, 2023 asking for the resignation of Pam Priddy as City Manager.
>
> This is based on her removing the SRO from the school, leaving the children unsafe and then attempting to falsify documents and distributing those falsified documents at a public school meeting." (Sic throughout.)

{¶22} Ms. Priddy stated she was "completely shocked by allegations of 'falsification' and had no idea what [Mr. Kline] meant at first what documents he was referring to. . . . The fact that [Mr. Kline] claimed that this alleged 'falsification' was enough to demand my resignation was shocking and confusing." She further asserted she

Case No. 2025-T-0031

"received an email from a reporter about 90 minutes after getting [Mr. Kline's] 'resignation' email that asked only about the call for resignation and 'falsification of documents.'"

{¶23} Ms. Priddy stated her belief was that Mr. Kline acted "in a malicious manner when he made the allegations that [she] falsified documents, distributed falsified documents, and had unilaterally removed the SRO [that] was removed. [Mr. Kline] simply and falsely stated that I removed the SRO and left the Newton Falls School children unsafe."

{¶24} On April 19, 2023, Ms. Priddy filed claims of defamation and invasion of privacy – false light against Mr. Kline. She alleged she suffered damages after the incident(s) described above relating to the staffing of the SRO and the fallout relating to the March 22, 2024 school board meeting. She maintained that Mr. Kline initiated a defamatory campaign designed to smear her reputation and cause the termination of her employment through false statements including allegations that, in the performance of her duties as City Manager, she falsified documents, doctored documents, presented such documents to the public with an intent to mislead and purposely spread false information. She also asserted Mr. Kline's statements implicated her in a crime and/or criminal "cover-up" and generally lied to the public about matters impacting the citizens of Newton Falls.

{¶25} On September 18, 2024, Mr. Kline moved for summary judgment and outlined several arguments in support, including, and most germane to this appeal,  that he was immune from civil liability under Chapter R.C. 2744, and that Ms. Priddy was unable to establish a genuine issue of material fact regarding her claims of defamation

and invasion of privacy – false light claims. Ms. Priddy duly opposed the motion, and Mr. Kline filed a reply in support of his motion.

{¶26} On April 16, 2025, the trial court denied Mr. Kline's motion for summary judgment, concluding "there are genuine issues of material fact relating to whether [Mr. Kline] is immune from [Ms. Priddy's] claims and there also genuine issues of material fact regarding the elements for defamation and invasion of privacy - false light."

{¶27} Mr. Kline now appeals, assigning the following as error:

{¶28} "The trial court erred by denying appellant Kenneth Kline's motion for summary judgment asserting immunity under Ohio's Political Subdivision Tort Liability Act, codified within Chapter 2744 of the Ohio Revised Code."

{¶29} Under this assignment of error, Mr. Kline asserts he is entitled to statutory immunity under R.C. 2744.03(A)(6), which provides that an employee of a political subdivision is immune from liability unless (1) the employee's acts or omissions are manifestly outside the scope of the employee's employment; (2) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) civil liability is expressly imposed on the employee by a section of the Revised Code. *See Zoldan v. Lordstown*, 2014-Ohio-5472, ¶ 21 (11th Dist.).

{¶30} A trial court's decision to grant summary judgment is reviewed by an appellate court under a de novo standard of review. *Grafton v. Ohio Edison Co.*, 1996-Ohio-336, ¶ 10. "A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision." *Peer v. Sayers*, 2011-Ohio-5439, ¶ 27 (11th Dist.).

{¶31} We shall first address a procedural point. Mr. Kline, in his appellate brief, cites this court's opinion in *Cty. Risk Sharing Auth., Inc. v. State*, 2022-Ohio-164, ¶ 12 (11th Dist.), for the following proposition:

> A reviewing court does not defer to the trial court's reasoning, but the lower court's "analysis often has persuasive effect during appellate review. We strongly encourage the trial court not to abandon its duty, but to continue [to] explain its reasoning when granting summary judgment." [*Scassa v. Dye*, 2003-Ohio-3480, ¶ 21 (7th Dist.)]. A barebones judgment entry is "unfair to the parties, who are essentially forced to simply refile their summary judgment motions in the appellate court due to being unsure why the trial court rendered the decision it did." *Mourton v. Finn*, . . . 2012-Ohio-3341, ¶ 9 [9th Dist.].

{¶32} Initially, the Ninth District in *Mourton* simply concluded that it is the trial court's "duty to resolve issues in the first instance." *Id.* We do not disagree with this point. We are a court of error or correction and must have an affirmative disposition of an issue before embarking on an analysis of an alleged error. The trial court provided this court with a sufficient basis for its decision, and we may therefore review it for error.

{¶33} With this in mind, we *do not* agree with the Seventh District's observation that a lower court's analysis in a summary judgment exercise has some "persuasive" value. A trial court's disposition or reasoning during an appeal on summary judgment is not accorded any deference and, as a result, we decline to reinforce the position that such a judgment has "persuasive effect." *See Scheetz v. Kentwood, Inc.,* 2003-Ohio-1209, ¶ 8 (11th Dist.) ("An appellate court conducts a de novo review of a trial court's judgment entry granting a motion for summary judgment, which means that no deference is shown to the trial court's decision.). *Maras v. Girard*, 2025-Ohio-608, ¶ 26 (11th Dist.) (An

appellate court affords no deference to a trial court's findings in conducting a de novo review.). We accordingly must review such judgments anew.

{¶34} That said, the trial court in this matter disposed of the issues before it and the record is clear regarding what issues it resolved. The record is not "barebones," and the trial court provided sufficient guidance to this court regarding its disposition. Considering this point, we shall proceed to address the merits of Mr. Kline's assignment of error.

{¶35} Under R.C. 2744.03(A)(6), employees of political subdivisions are immune from liability unless the employee's acts were manifestly outside the scope of the employment; the employee's acts or omissions were made with malicious purpose, in bad faith, or in a wanton or reckless manner; or civil liability is expressly imposed upon the employee by a section of the Revised Code. Pursuant to this section, "government employees are immune from tort liability for actions that fall within the scope of their employment and official responsibilities," however their "immunity is *not* absolute." (Emphasis added.) *Hill* at ¶ 35, citing *Maternal Grandmother, ADMR v. Hamilton Cty. Dept. of Job & Family Servs.*, 2021-Ohio-4096, ¶ 7. "Government employees acting within the scope of their employment are not entitled to immunity if 'the employees' acts or omissions in the course and scope of their employment were wanton[,] reckless,' malicious, or done in bad faith." *Hill* at ¶ 35, quoting *Maternal Grandmother* at ¶ 7, citing R.C. 2744.03(A)(6)(b).

{¶36} The Supreme Court of Ohio has held that "reckless" and "wanton" describe different and distinct degrees of care that are not interchangeable. *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 31. "Reckless conduct is characterized by the conscious disregard of

Case No. 2025-T-0031

or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." (Citations omitted). *Id.* at ¶ 34.

{¶37} "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." (Citation omitted.) *Id.* at ¶ 33. "[O]ne acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results." (Citation omitted.) *Id.*

{¶38} "Malice" is characterized by "hatred, ill will or a spirit of revenge," or "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty,* 32 Ohio St.3d 334, 336(1987). It also refers to "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." (Citation omitted.) *Jackson v. Butler Cty. Bd. of Cty. Commrs.*, 76 Ohio App.3d 3d 448, 454 (12th Dist.1991).

{¶39} "Bad faith" connotes a "'dishonest purpose'" or "'conscious wrongdoing. . . .'" *Canfora v. Coiro*, 2007-Ohio-2314, ¶ 72 (11th Dist.), quoting *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90 (1st Dist. 1995). It also embraces more than bad judgment and involves a lack of reasonable justification. *See Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 554 (1994)

{¶40} The demonstration of recklessness is subject to a high standard when attempting to abolish employee immunity under R.C. 2744.03(A)(6)(b). *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 2008-Ohio-2567, ¶ 37.

Case No. 2025-T-0031

**{¶41}** Mr. Kline argues that he, as the former mayor of Newton Falls, is entitled to immunity under R.C. 2744.03(A)(6) for his statements, because his statements were not manifestly outside the scope of his employment and they were not made with malice, bad faith, or in a wanton or reckless manner. He additionally contends that Ms. Priddy's defamation and invasion of privacy – false light claims fail as a matter of law because he did not make the statements with actual malice, i.e., with knowledge of their falsity or with reckless disregard to their falsity. The first issue is dispositive of this appeal.

**{¶42}** Regarding his immunity claim, we reiterate that the March 24, 2023 email published by Mr. Kline to Newton Falls City Council, which moved for Ms. Priddy's resignation, stated:

> As the mayor of Newton Falls I am on this day, Friday March 24, 2023 asking for the resignation of Pam Priddy as City Manager.
>
> This is based on her removing the SRO from the school, leaving the children unsafe and then attempting to falsify documents and distributing those falsified documents at a public school meeting. (Sic throughout.)

**{¶43}** The evidence demonstrated that Ms. Priddy communicated with Mr. Kline regarding the SRO matter on March 16, 2023. Ms. Priddy acknowledged the prior call and eventual message was related to addressing the SRO issue. Mr. Kline explained that the superintendent, Mr. Christopher, had sent an email to the school board stating, "they will have [a] sheriff *there tomorrow* and are working on a permanent agreement." (Emphasis added.) Mr. Kline also advised Ms. Priddy that the discussions or arrangements "worked out best for all involved." Mr. Kline also thanked Ms. Priddy for the information she had provided.

Case No. 2025-T-0031

{¶44} Ms. Priddy's March 16, 2023 email sent to Mr. Chirstopher did indicate she would be "pulling" the acting SRO. In response, later that day, Mr. Christoper emailed the Board advising that Ms. Priddy "threatened" to pull the SRO if the Board did not agree to pay the additional amount. Mr. Christopher's communication did not necessarily capture the meaning Ms. Priddy ascribed to her initial email. Nevertheless, his representation to the Board is not entirely unreasonable and represents, at most, a misunderstanding of Ms. Priddy's purported intent.

{¶45} Further, Ms. Priddy's March 16, 2023 text with Mr. Kline reflects a relative factual understanding between those individuals: (1) that Ms. Priddy did not know whether the acting SRO should report the following day, and (2) that Mr. Kline understood, by way of his wife, that a sheriff's deputy would be acting as an SRO "tomorrow," i.e., March 17, 2023, and the Board was working on a permanent agreement with the Sheriff's Office.

{¶46} Ms. Priddy subsequently sent a text to the acting SRO, relaying to him that he need not report to the school on March 17, 2023, because, via Mr. Kline's representations, a Sheriff's deputy would be on site as an SRO. The acting SRO did not appear.

{¶47} Later, Ms. Priddy submitted a collection of documents to the public during a Board meeting on March 23, 2023. The only feature of the documents at issue that was redacted was a preliminary statement on the March 16, 2023 text exchange into "why" Ms. Priddy was contacting Mr. Kline. Mr. Kline seems to assert this redaction was a "falsification" or "doctoring" of the message exchange.

{¶48} Applying the relevant definitions to the case at bar and in light of the heightened standard enunciated by the Supreme Court of Ohio, we *cannot* conclude that

Case No. 2025-T-0031

Mr. Kline's email, while potentially framed in a hasty or incautious fashion, constitutes behavior that was malicious, in bad faith, wanton, or reckless. In light of the facts, which involve a highly controversial and politically vexing issue, it is reasonable to conclude that much, if not all, of the eventual communications that led to Mr. Kline's email were premised upon or engendered by some reasonable degree of miscommunication and/or misunderstanding.

{¶49} Although Mr. Kline's email implies Ms. Priddy "falsified documents," it also indicates she "attempted" to do so. The minor redaction is obviously not a clear "falsification," but, read in context, Mr. Kline's statement is, at most, careless or sent without reasonable care regarding the nuances of Ms. Priddy's redaction. There was no allegation of criminal conduct. Moreover, the email fails to indicate it was sent with a conscious disregard to a known or obvious risk of harm to Ms. Priddy.

{¶50} Similarly, we recognize that Ms. Priddy did not actually remove, i.e., dismiss, the acting SRO. She admitted, however, to advising the SRO not to report to the school without full confirmation from the Board that a substitute SRO would be on site the following day. In this respect, Mr. Kline's email, while somewhat misleading, is again, at worst, negligent or written inartfully.

{¶51} Finally, we again acknowledge Mr. Kline's statement that Ms. Priddy's actions or omissions functioned to render "children unsafe" is problematic. Nevertheless, understood in the greater context of the circumstances, we discern his communication to be merely careless or inattentive to the full circumstances of the matter at issue. This matter involved a particularly disconcerting and contentious public issue percolating in the village–an issue that was brought directly to Mr. Kline's personal attention in his

capacity as mayor. He responded as mayor and his language, while indelicate, cannot be deemed reckless, malicious, wanton, or in bad faith.

{¶52} R.C. Chapter 2744 does not actually define the type of employee acts that fall "manifestly outside the scope of employment or official responsibilities" under R.C. 2744.03(A)(6)(a). "In the context of immunity, '[a]n employee's wrongful act, even if it is unnecessary, unjustified, excessive or improper, does not automatically take the act manifestly outside the scope of employment.'" *Jackson v. McDonald*, 144 Ohio App.3d 301, 307 (5th Dist. 2001), quoting *Elliott v. Ohio Dept. of Rehab. & Corr.*, 92 Ohio App.3d 772, 775 (10th Dist. 1994). "The act must be so divergent that it severs the employer-employee relationship." *Elliott* at 775. "Conduct is within the scope of employment if it is initiated, in part, to further or promote the [employer's] business." *Martin v. Cent. Ohio Transit Auth.*, 70 Ohio App.3d 83, 92 (10th Dist. 1990).

{¶53} As discussed above, Mr. Kline's statements in his email, while possibly unnecessary, unjustified, or even excessive, were merely carelessly worded. He was acting in his role as mayor addressing certain nuances of a highly contested village-oriented matter. His conduct was not so divergent as to undermine his role as mayor of the village and was ostensibly accomplished to calm or ameliorate the frustrations of the citizens of the village. Again, we recognize the email was not a model of conciliatory conflict resolution. Still, we cannot conclude, given the surrounding circumstances, that its communication was "manifestly outside the scope" of Mr. Kline's "employment and official responsibilities" as mayor of the Village.

Case No. 2025-T-0031

{¶54} We accordingly hold the trial court erred in denying Mr. Kline immunity under R.C. 2744.03(A)(6)(b). He is entitled to immunity because his actions were not manifestly outside the scope of his employment and official responsibilities.

{¶55} Mr. Kline's assignment of error has merit.

{¶56} The judgment of the Trumbull County Court of Common Pleas is reversed, and judgment is entered in favor of Mr. Kline on the issue of immunity.


ROBERT J. PATTON, P.J.,

JOHN J. EKLUND, J.,

concur.

Case No. 2025-T-0031

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignment of error has merit. It is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is reversed, and judgment is entered in favor of Mr. Kline on the issue of immunity.

Costs to be taxed against appellee.

_____
JUDGE EUGENE A. LUCCI

_____
PRESIDING JUDGE ROBERT J. PATTON,
concurs

_____
JUDGE JOHN J. EKLUND,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-T-0031